UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CENTER FOR THE STUDY OF SERVICES, ALSO DBA CONSUMERS' CHECKBOOK, | : : : : |
| Plaintiff, | : : |
| v. | : : : Civil Action No. 14-498 (GK) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | : : : : |
| Defendants. | : : |

---

### MEMORANDUM OPINION

Plaintiff Center for the Study of Services ("Plaintiff" or "CSS"), which is also known as "Consumers' CHECKBOOK," brings this action against Defendants the U.S. Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") (collectively, "Defendants" or "the Government") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff seeks certain information related to health plans offered pursuant to the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). The Government has withheld the requested information under FOIA Exemption 4, which exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C.

§ 552(b)(4). Plaintiff initially asked this Court to enjoin Defendants from withholding health plan benefits data for the 2014 plan year, which the Government subsequently released. Plaintiff has since requested substantially similar data for the 2015 and 2016 plan years and asks the Court to permanently enjoin Defendants from failing to disclose this type of information in future years.

On October 31, 2014, Plaintiff filed its Motion for Summary Judgment ("Pl.'s Mot.") [Dkt. No. 28]. On December 15, 2014, the Government filed a Combined Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment ("Gov't's Mot.") [Dkt. No. 32]. On December 30, 2014, Plaintiff filed its Combined Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Opp'n") [Dkt. No. 36]. Finally, on January 20, 2015, the Government filed its Reply in Support of Its Motion for Summary Judgment ("Gov't's Reply") [Dkt. No. 40].[1]

Upon consideration of the Motions, Oppositions, Replies, the entire record herein, and for the reasons stated below, Plaintiff's

---

[1] The Government refers to its Reply as its Combined Reply in Support of Its Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment, but the Government's Combined Cross-Motion and Opposition, of course, serves as the Government's Opposition. Therefore, the Reply is cited herein as Gov't's Reply.

-2-

Motion for Summary Judgment is hereby **denied**, and the Government's Motion for Summary Judgement is hereby **denied**.

I.    **BACKGROUND**

    **A.    FOIA**

FOIA allows individuals to request the disclosure of records from government agencies. § 552(a)(3). The Act is "a means for citizens to know what their Government is up to." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 171 (2004) (internal citations and quotation marks omitted). FOIA thus "creates a liberal disclosure requirement, limited only by specific exemptions which are to be narrowly construed." Bristol-Myers Co. v. F.T.C., 424 F.2d 935, 938 (D.C. Cir. 1970).

When an agency receives a request that "reasonably describes" the records sought, § 552(a)(3)(A), it must "conduct[] a search reasonably calculated to uncover all relevant documents." Morely v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation marks omitted). The agency must then disclose any responsive agency records it locates, except to the extent that any such records are protected from disclosure by one of FOIA's nine statutory exemptions. See 5 U.S.C. § 552(b). If an agency withholds responsive records not covered by one of FOIA's exemptions, the requester may, after exhausting administrative remedies, file a lawsuit in district court to challenge the agency's decision to

-3-

withhold. See id. § 552(a)(4)(B). "Under FOIA, an agency has the
burden to demonstrate that the withheld documents are exempt from
disclosure, which it may meet by submitting affidavits that show,
with reasonable specificity, why the documents fall within the
exemption. The affidavits will not suffice if the agency's claims
are conclusory, merely reciting statutory standards, or if they
are too vague or sweeping." Biles v. Dep't of Health & Human
Servs., 931 F. Supp. 2d 211, 223 (D.D.C. 2013) (internal quotation
marks, citation, and brackets omitted).

### B.   FFM Data Submission Process

Under the ACA, individuals and families may purchase health
care insurance plans during the annual Open Enrollment Period
through on-line marketplaces called "exchanges," which are
operated by the federal or state governments. The exchange created
by the federal government -- the Federally-Facilitated Marketplace
("FFM") -- is administered by CMS and its Center for Consumer
Information and Insurance Oversight ("CCIIO"). See Plaintiff's
Statement of Material Facts at ¶ 3 ("Pl.'s SMF") [Dkt. No. 28-2].

Insurers who choose to offer Qualified Health Plans ("QHPs")
through the FFM must submit plan benefits information to CMS each
year during the Initial FFM QHP Application Submission Window. See
CCIIO, 2015 Letter to Issuers in the Federally-facilitated
Marketplaces (Mar. 14, 2014) ("2015 CCIIO Letter") [Dkt. No. 28-

-4-

7]. Insurers in 36 states offered QHPs through the FFM for the 2015 plan year. Pl.'s SMF at ¶ 4.

Once the Government has received insurers' QHP data for an upcoming plan year, it begins a lengthy, multi-step review process that may result in a number of changes to the initially-submitted data. 2015 CCIIO Letter at 6-11. "CCIIO reviews the data to ensure it meets federal regulatory requirements and will display correctly on HealthCare.gov [the FFM's website]." Gov't's Mot. at 7. For plans offered in certain states, state officials work in concert with the federal Government to review and approve submitted QHP data. 2015 CCIIO Letter at 9-10; Pl.'s SMF at ¶ 4. Insurers are limited in the changes they may make to submitted QHP data during the submission cycle. Id. at 10. In the final stages of review, CMS (and if relevant, the state involved) must approve any proposed changes. Id.

For the 2015 plan year, CMS required insurers to submit their initial QHP applications by June 27, 2014. Id. at 8, 10. After June 27, 2014, insurers could not change their proposed service areas or add new insurance plans but were otherwise permitted by CCIIO to amend their data. Gov't's Statement of Material Facts at ¶ 14 ("Gov't's SMF") [Dkt. No. 32-1]. Following the initial data submission, CMS completed two rounds of review which ended about August 25, 2014. 2015 CCIIO Letter at 10.

-5-

September 4, 2014, marked the deadline to submit "final" QHP application data and the beginning of the Limited Data Correction Window. Id. After the September 4th deadline, insurers were permitted to make changes only with "pre-approv[al] by CMS and [if relevant for the particular state] the state." Id.[2]

On October 6, 2014, the Limited Data Correction Window closed, further restraining the scope of permissible amendments to QHP data. Gov't's SMF at ¶ 14. Although limited in terms of plan amendments, insurers remained free to withdraw QHPs they had planned to offer, and at least some insurers did so. Gov't's SMF at ¶ 11.

In October 2014, the Government provided insurers with final certifications of their ability to participate in the FFM. Pl.'s SMF at ¶ 32. Insurers were then required to sign FFM agreements before the beginning of the Open Enrollment Period on November 15, 2015. Gov't's SMF at ¶ 8-9. The Government does not consider "[d]ata related to plan offerings [to be] final until agreement signing and plan confirmation [which occurs] approximately two weeks prior to [O]pen [E]nrollment." Id. at ¶ 9.

---

[2] The Parties do not agree as to the scope of permissible changes to QHP data following the initial and final QHP application data deadlines. See e.g., Pl.'s SMF at ¶ 27; Gov't's Resp. to Pl.'s SMF at ¶ 27. They do agree, however, that changes made after September 4, 2014 required CMS approval. Gov't's Resp. to Pl.'s SMF at ¶ 27.

Insurers planning to offer QHPs through the FFM for the 2016 plan year were required to submit plan benefits data by May 15, 2015. See CCIIO, FINAL 2016 Letter to Issuers in the Federally-facilitated Marketplaces ("2016 CCIIO Letter"), at 7 (Feb. 20, 2015), [Dkt. No. 42-2].[3] The 2016 CCIIO Letter sets forth a data review process for the 2016 plan year similar to the one described above for the 2015 plan year.

### C.   Factual Background

Plaintiff CSS is a non-profit 501(c)(3) corporation located in Washington, D.C. whose mission includes conducting and supporting studies of consumer services (including those provided by government programs) and publishing materials to educate and inform consumers about such services. Pl.'s Compl. at ¶ 10 [Dkt. No. 1]. It seeks certain information about the QHPs that insurers will offer on the FFM in order to create an online tool to help consumers compare health plans. Id. If Plaintiff's tool is to serve its purpose of assisting consumers in the selection of health plans, Plaintiff must obtain health plan benefits data each year substantially before the beginning of the Open Enrollment Period. Id. at ¶ 5.

---

[3] Available at http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2016-Letter-to-Issuers-2-20-2015-R.pdf.

-7-

On November 29, 2013, pursuant to FOIA, Plaintiff submitted a request for health plan benefits data provided to CMS by all insurers planning to offer QHPs through the FFM for plan year 2014. Pl.'s SMF ¶ 6. Specifically, Plaintiff's letter requested the "complete set of insurance carrier-submitted facts on the benefits (deductibles, coinsurance rates, copayment amounts, out-of-pocket limits, etc.) offered by each Federally-Facilitated Exchange/Marketplace-eligible plan [QHP] [delivered in particular template formats]." Letter from Robert Krughoff, President, Consumers' CHECKBOOK, to Freedom of Information Officer, Ctrs. for Medicare & Medicaid Servs. (Nov. 29, 2013) at 1 [Dkt. No. 11-4]. Noting the time-sensitive nature of its request, Plaintiff asked CMS for "a very quick response." Id. at 2.

On December 2, 2013, CMS granted Plaintiff's request for expedited processing but did not release the requested 2014 data or set a production schedule. Pl.'s SMF at ¶ 7.

On March 24, 2014, nearly four months after submitting its request, Plaintiff filed its Complaint challenging the Government's failure to produce the requested information. Among other things, the Complaint asks this Court to "[p]ermanently enjoin Defendants from refusing to disclose or delaying the disclosure of substantially the same information sought for future plan years[.]" Pl.'s Compl. at ¶ D.

-8-

On May 2, 2014, Plaintiff filed a Motion for Preliminary Injunction [Dkt. No. 11]. On May 20, 2014, the Court denied Plaintiff's Motion, holding that Plaintiff failed to establish that it or the public would suffer an irreparable injury from the Government's failure to produce the requested data. Memorandum Opinion and Order [Dkt. No. 17]. The Court also ordered Defendants to file a detailed, written Status Report concerning production of the requested information. Id.

On June 25, 2014, the Government filed its Status Report, stating that it would provide Plaintiff with the 2014 plan year data before July 1, 2014 [Dkt. No. 20]. However, the Government did not complete production of the data identified in Plaintiff's initial FOIA request until August 28, 2014. Joint Status Report [Dkt. No. 27].

On June 30, 2014, Plaintiff submitted a second FOIA request, which called for 2015 plan year data substantially similar to the 2014 plan year data that were the subject of the first request. Letter from Robert Krughoff, President, Ctr. for the Study of Servs., to Olen Clybourn, Acting Freedom of Info. Officer, CMS (June 30, 2014) [Dkt. No. 28-4]. On July 30, 2014, CMS denied Plaintiff's second FOIA request, invoking FOIA Exemptions 4 and 5, § 552(b)(4)-(5). Letter from Hugh Gilmore, Dir., Div. Freedom of Info., CMS, to Robert Krughoff, Center for the Study of Servs.

(July 30, 2014) [Dkt. No. 28-5]. On August 26, 2014, Plaintiff requested an administrative appeal. Pl.'s SMF at ¶ 18-20.

On September 24, 2014, CMS issued its Appeal Decision, which upheld the denial of Plaintiff's request. Letter from Andrew Slavitt, Principal Deputy Adm'r, CMS, to Caroline M. Brown and Paige M. Jennings, Covington & Burling LLP (Sept. 24, 2014) ("CMS Appeal Decision") [Dkt. No. 28-7]. CMS overturned its initial reliance on Exemption 5. However, it reaffirmed its finding that the requested data were exempt from FOIA under Exemption 4 because release would cause substantial competitive harm to FFM-participating insurers and would otherwise harm the FFM program. Id. at 3-4. The Appeal Decision also noted that CMS would release the requested data once it had been "finalized" -- just before the beginning of the Open Enrollment Period on November 15, 2014. Id. at 5.

On October 31, 2014, Plaintiff filed the present Motion for Summary Judgment seeking a "declaration that CMS's invocation of Exemption 4 to withhold the requested data is improper, as well as an order that [CMS] produce the requested 2015 data." Pl.'s Mot. at 2.

On November 14, 2014, CMS released the requested 2015 plan benefits data, and the Open Enrollment Period began the following day. Gov't's SMF at ¶ 19.

On November 24, 2014, pursuant to Executive Order 12,600 and 45 C.F.R. § 5.65(d), Defendants sent a letter to FFM-participating insurers requesting their views on release of QHP application information in future years before data finalization and insurer agreement execution. Id. at ¶ 6. Defendants received letters from 78 insurers generally objecting to the release of QHP data ("insurer letters"). Id. at ¶7.

On May 21, 2015, Plaintiff submitted a third FOIA request for the 2016 plan year benefits data. On May 22, 2015, Plaintiff filed a Status Report [Dkt. No. 42] notifying the Court of its pending FOIA request for the 2016 data.

## II.  STANDARD OF REVIEW

Summary judgment should be granted only if the moving party has shown that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. See Celotex, 477 U.S. at 323. In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Keyes v. Dist. of Columbia, 372 F.3d 434, 436 (D.C. Cir. 2004).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## III. ANALYSIS

### A.    Mootness

The Government contends that Plaintiff's action is moot. It argues that because it has released the 2014 and 2015 plan year data that Plaintiff requested, Plaintiff has received all the relief it seeks.

Our Court of Appeals has made clear, however, that the release of records following a "specific request under the FOIA . . . will

-12-

not moot a claim that an agency policy or practice will impair the party's lawful access to information in the future." Payne Enters. v. U.S., 837 F.2d 486, 491 (D.C. Cir. 1988).[4] Plaintiff intends to request substantially the same information from Defendants every year and has requested an injunction barring the Government from withholding it under Exemption 4. Since filing this Motion, Plaintiff has also provided notice that it has already requested benefits data for the 2016 plan year. Status Report [Dkt. No. 42]. The Government has made clear that, in future years, it plans to withhold the requested information under Exemption 4 until the beginning of the Open Enrollment Period. Gov't's Mot. at 3 ("Defendants . . . have no objection to releasing such information for future plan years once the [O]pen [E]nrollment [P]eriod begins. Defendants, however object to prematurely releasing proprietary and commercial information . . . prior to the [O]pen [E]nrollment

---

[4] The Government attempts to distinguish Payne by arguing that the challenge presented in Payne was not moot only because the agency had unlawfully withheld documents under FOIA Exemptions 4 and 5, whereas in this case, the Government is right to withhold the requested information under Exemption 4. Gov't's Reply at 10-11. The Government's argument rests entirely upon the presumption that it will prevail on the merits, and thus, puts the cart before the horse. "[M]ootness should not be confused with the merits. An argument that an action is moot because the plaintiff is not entitled to the requested relief, for example, is no more than an argument on the merits that should be decided on the merits." 13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.1 (3d ed. 2015).

[P]eriod[.]"). Thus, the controversy described in Plaintiff's Complaint is not moot but ongoing.

Moreover, the time-sensitive nature of annually-updated plan benefits data renders the Government's allegedly unlawful withholding "capable of repetition yet evading review." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000). Challenges to such conduct are not moot if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin., 102 F. Supp. 2d 21, 23 (D.D.C. 2000) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)); see also Newport Aeronautical Sales v. Dep't of Air Force, 684 F.3d 160, 164 (D.C. Cir. 2012) (FOIA action not moot because agency had "no intention of abandoning [] policy because it d[id] not believe the policy violate[d] FOIA"). Given the time required for a FOIA case to fully ripen and the Government's statement that, upon future requests for plan benefits data, it will rely on Exemption 4 to withhold the data until the beginning of the annual Open Enrollment Period, Gov't's Mot. at 3, the Court has little difficulty concluding that this action is not moot.

### B.   FOIA Exemption 4

Exemption 4 of FOIA permits agencies to withhold "[1] trade secrets and commercial or financial information [2] obtained from a person [that is] [3] privileged or confidential[.]" 5 U.S.C. § 552(b)(4). The Parties agree that the information Plaintiff seeks is "commercial or financial" and was "obtained from a person." See Pub. Citizen Health Research Group v. Nat'l Insts. of Health, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) ("Public Citizen v. NIH") ("no doubt that a corporation may be . . . a person" under Exemption 4); Pub. Citizen Health Research Group v. FDA, 704 F.2d 1280 (D.C. Cir. 1983) ("Public Citizen v. FDA") (information is "commercial or financial" when it relates to commerce). Furthermore, neither Party asserts that the requested information is "privileged" or constitutes "trade secrets[.]" Accordingly, the only question is whether the requested information qualifies as "confidential" under 5 U.S.C. § 552(b)(4).

The Government contends that all of the information Plaintiff requested is confidential and thus exempt from FOIA. Plaintiff disagrees, arguing that all of the requested information falls outside of Exemption 4, or in the alternative, that some of the requested information falls outside of the Exemption and is reasonably segregable from any exempt information.

-15-

The appropriate test for determining whether information is confidential depends on whether the Government obtained the information by way of voluntary or compelled submission. Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992) ("Critical Mass III"). When "the information sought is given to the Government voluntarily, it will be treated as confidential under Exemption 4 if it is of a kind that the provider would not customarily make available to the public." Id.

However, when the Government possesses the information at issue by way of compulsion, Courts must apply the two-part test initially set forth in Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974). The National Parks test "define[s] as 'confidential' any financial or commercial information whose disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future;[5] or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Critical Mass III, 975 F.2d at 878 (citing Nat'l Parks, 498 F.2d at 770) (internal citations omitted).

Information provided to the Government "as a condition of doing business" is generally considered to have been coerced rather

---

[5] The Government does not directly address the first prong of the National Parks test in its briefs.

than provided voluntarily. <u>Biles v. Dep't of Health & Human Servs.</u>, 931 F. Supp. 2d 211, 220 (D.D.C. 2013). In order to offer QHPs through the FFM, insurers must submit plan benefits data to CMS. Accordingly, the Parties agree that the latter test, applicable to involuntary submissions of information, governs the Court's analysis in this case. Gov't's Mot. at 13; Pl.'s Mot. at 12-13.

> 1.   *Competitive Harm*

Defendants' chief argument against disclosure is that release of the requested plan benefits data at any time before the beginning of the Open Enrollment Period will cause participating insurers to suffer competitive harm. In order "for the [G]overnment to preclude disclosure based on a competitive injury claim, it must prove that the submitters '(1) actually face competition, and (2) substantial competitive injury would likely result from disclosure.'" <u>Niagara Mohawk Power Corp. v. U.S. Dep't of Energy</u>, 169 F.3d 16, 18 (D.C. Cir. 1999) (quoting <u>Nat'l Parks & Conservation Ass'n v. Kleppe</u>, 547 F.2d. 673, 679 (D.C. Cir. 1976).

> a.   Actual Competition

The Government argues that insurers submitting QHPs on the FFM face actual competition both from each other and from insurers offering plans outside of the FFM.

According to the Government, several sources demonstrate competition among insurers offering QHPs on the exchanges. The

Government cites 78 letters from insurers (or their parent companies) stating that disclosure of plan benefits information would likely cause competitive harm. Gov't's Mot. at 14-15; Gov't's Reply at 2 (citing [Dkt. No. 32-4, 5]). Although the content of these letters is most relevant to the second prong of the competitive harm test, the Government relies on the letters' descriptions of competitive harm to suggest that the insurers are engaged in actual competition.

The Government also contends that the "one-stop-shop" nature of the FFM "increas[es] competition between insurance companies." Gov't's Reply at 2-3 (citing CMS, Creating a New Competitive Health Insurance Marketplace[6]). Finally, the Government points to a Bloomberg Government article that states, "Competition among insurers offering coverage through federal exchanges established under the Affordable Care Act is driving down the premiums charged in the new marketplaces by as much as one third[.]" Peter Gosselin, Exchange Competition Cuts Health Insruance Costs: BGov Insight, Bloomberg Government (October 8, 2013).[7] The Bloomberg article is not evidence and is certainly no substitute for affidavits, expert

---

[6] Available at http://www.cms.gov/CCIIO/Resources/Marketplace-Grants/.

[7] Available at http://about.bgov.com/2013-10-08/exchange-competition-cuts-health-insurance-costs-bgov-insight/.

reports, or deposition testimony -- evidentiary sources that the Government has not brought to bear.

Viewed in the light most favorable to Plaintiffs, the Government has put forth no reliable evidence of actual competition between insurers participating in the FFM. The authors of the 78 letters HHS relies on were sent a carefully-worded letter presenting HHS' legal interpretation of Exemption 4 and asking whether each insurer's application information for a given plan year may be protected by Exemption 4. HHS, Letter to Insurers at 34-35 [Dkt. No. 32-3] (setting forth the Government's theory of Exemption 4's application to plan benefits data). Therefore, it is not surprising that many of the letters describing the potential for competitive harm agree with the Government's position.

In response, Plaintiffs cite the Government's own estimate "that at least 95 percent of consumers will be automatically re-enrolled in a plan in 2015, and will not have to make any affirmative choice," Pl.'s Mot. at 13-14, as evidence of a lack of competition among FFM-participating insurers.

In sum, because there are material facts in dispute, the Government has failed to demonstrate that FFM-participating insurers are engaged in actual competition with each other.

In addition, the Government fails to show that FFM-participating insurers are in competition with insurers who offer

-19-

plans outside of the FFM. The Government points to the same 78 letters describing the competitive harm that may befall FFM insurers if off-FFM insurers obtain the requested plan benefits data. Gov't's Reply at 2 (citing [Dkt. Nos. 32-4, 33-5]). Although these letters suggest that FFM-participating insurers compete with insurers who offer plans outside of the FFM, they could just as easily suggest hypothetical or potential competition rather than actual competition. Thus, with respect to competition between FFM-participating insurers and non-FFM-participating insurers, the Government also fails to prove actual competition.[8]

Given the inadequacies of the Government's evidence, it has not established that FFM-participating insurers face <u>actual</u> competition from any source. Thus, its Motion cannot prevail on grounds of competitive harm.

Plaintiff has also submitted a Motion for Summary Judgment. Therefore, as to its arguments, the Court must now consider the evidentiary record in the light most favorable to the Government. As discussed above, the insurer letters provide weak support for the Government's allegation of actual competition. However, when

---

[8] Plaintiff also notes that "an estimated 85% of Exchange enrollees depend on subsidies to purchase coverage. Given that unsubsidized coverage in the non-[FFM] market is not significantly cheaper than [FFM] coverage, it seems unlikely that [FFM] enrollees could afford to purchase coverage outside of the [FFM] or that off-[FFM] plans are competing for those same customers." Pl.'s Opp'n at 4.

viewing Plaintiff's Motion in the light most favorable to the Government, one could conclude that there is actual competition from the letters' descriptions of competitive harm that would arise from pre-Open Enrollment disclosure of plan benefits data. Moreover, Plaintiff has not countered the Government's evidence (weak as it is) of actual competition with any documentary evidence of its own. Thus, there is a genuine issue of fact as to whether FFM-participating insurers face actual competition.

However, this factual dispute does not entirely preclude Summary Judgment[9] because: 1) Plaintiff may prevail by demonstrating that even if insurers faced actual competition, early disclosure would not give rise to a likelihood of substantial competitive harm and would do no harm to the FFM program; and, on the other hand, 2) the Government may prevail on its alternative "program effectiveness" ground for withholding the data sought. See infra Section 2.

b.    Likelihood of Substantial Competitive Harm

In addition to a demonstration of actual competition, Exemption 4 requires a showing that a "likelihood of substantial competitive injury" would arise from release of the data Plaintiff has requested. Niagara Mohawk Power Corp., 169 F.3d at 18. "[W]hile

---

[9] Thus, neither Party has submitted sufficient convincing evidence to prevail on its Motion for Summary Judgment.

the parties cannot rest on a 'conclusory and generalized allegation of substantial competitive harm,' the court need not engage in a sophisticated economic analysis to determine whether there is a likelihood of substantial competitive injury." Public Citizen v. NIH, 209 F.Supp.2d at 46 (quoting Public Citizen v. FDA, 704 F.2d at 1291).[10] However, the harm alleged is relevant only if it arises from the "affirmative use of proprietary information by competitors." Public Citizen v. FDA, 704 F.2d at 1291 n.30.

The Government argues that several forms of competitive harm would arise from compliance with Plaintiff's request: 1) early disclosure would allow insurers to learn about the rates and plan specifications of their competitors in order to undercut each other; 2) pre-Open Enrollment release of plan benefits data would cause harm to innovative insurers by allowing competitors to amend their plans in order to produce more appealing innovations; and 3) because plan information may change up to the beginning of the Open Enrollment Period, early disclosure would make conflicting

---

[10] The Government contends that courts "generally defer to the agency's predictive judgment as to the repercussions of disclosure." Gov't's Mot. at 13 (quoting United Techs. Corp. v. Dep't of Defense, 601 F.3d 557, 563 (D.C. Cir. 2010)). The passage the Government quotes, however, concerned a "reverse FOIA" case brought under the Administrative Procedure Act ("APA"). Id. Such cases are reviewed under the APA's deferential "arbitrary and capricious" standard. Id. Agency determinations in direct FOIA challenges, like the case at hand, are reviewed de novo. 5 U.S.C. § 552(a)(4)(B).

data sets available to the public and lead to consumer confusion, which might harm some insurers to the benefit of others.

The Government bases its argument almost exclusively on the 78 insurer letters objecting to disclosure, id. at 14-15; see also [Dkt. Nos. 32-3, -4 , -5], which the Court has already found to be less than compelling. The Government also refers to a Declaration by CCIIO Director Kevin Counihan. ("Counihan Decl.") [Dkt. No. 32-2].

To counter the Government's position, Plaintiff primarily cites letters that the Government has sent (or plans to send) to insurers, which detail the process for submitting and reviewing plan benefits data in order to offer health insurance plans on the FFM ("process letters"). E.g., 2015 CCIIO Letter; 2016 CCIIO Letter. Plaintiff also makes reference to publicly available information on the Government's and insurers' websites. E.g., Website Screen Shots [Dkt. Nos. 28-11, 37-2].

Importantly, the Parties disagree about when the insurer-submitted QHP data becomes "final" during the review process. The Government contends that the data for any particular insurer is not final until the insurer and the Government have executed an agreement for the plan year -- a step that occurs just before the beginning of the Open Enrollment Period.

Plaintiff argues that after the initial data submission deadline, insurers are greatly limited in their ability to alter their submitted data, and that after the next deadline for "final QHP data submissions," insurers can make almost no changes at all. Thus, Plaintiffs contend that, as a practical matter, data should be considered final after its initial submission or, at the very latest, after the final data submission deadline. Accordingly, the ultimate resolution of this case will almost certainly require an answer to the question of when QHP data may be considered final.

i)   Undercutting

The Government argues that "[d]isclosing the proposed health plans prior to approval and clearance by HHS would allow the submitters' competitors to 'learn about rates and plan information that the submitters were planning to market,' and those competitors could use the information to their advantage, i.e. by developing competing plans and rates." Gov't's Mot. at 15 (source of quoted material not indicated in original); see also Gov't's Reply at 4 (citing numerous insurer letters).

Plaintiff objects on several grounds. First, citing a letter from the Government to FFM-participating insurers, Plaintiff asserts that once insurers have submitted their plan data, they have "very little ability to change their plan benefits" and

-24-

accordingly, could not undercut their competitors. Pl.'s Mot at 14-15.

The Government responds by describing a variety of scenarios in which insurers could significantly change their data after the deadlines Plaintiff has cited. Gov't's Reply at 4 (citing insurer letters). But the Government also admits that it currently "reviews the data submitted by the issuers mainly for regulatory compliance and accuracy of data[,]" Gov't's Mot. at 17, thereby suggesting, as Plaintiff argues, that there will be no substantive changes.

Plaintiff also contends that release of all FFM-participating insurers' data -- not just particular insurers' data -- will mitigate any possible harm by placing all insurers on equal footing. Pl.'s Mot. at 20. The Government responds that "larger entities who will have the staff and resources to quickly change their products based on competitors' information" will gain an advantage over smaller insurers through the early release of plan data. Gov't's Mot. at 20.

Plaintiff responds that, to a large extent, FFM-participating insurers already know the details of the plans competitors submit at the first deadline. As noted above, CMS expects 95 percent of consumers to automatically re-enroll in their current plans. Under CMS regulations, automatic re-enrollment can only occur if plans retain roughly the same benefits and cost-sharing structure. See

45 C.F.R. §§ 147.106(a), (b)(4), (c), (e). Accordingly, plans covering the vast majority of consumers are not expected to undergo significant changes, severely blunting any competitive advantage that might be gained from early access to plan benefits data.

However, CMS's prediction of general stability among the plans offered presumes the status quo (i.e., that plan benefits data will not be released until Open Enrollment). The Government's declarant states that if insurers had earlier access to their competitors' data, "CCIIO expects that competitors would change plan designs or prices[.]" Counihan Decl. at ¶ 6 (emphasis added).

The Government also contends that even if the information that Plaintiff requests would not lead to competitive harm, the requested information could be paired with publicly available information, and together the requested and publicly available information would likely lead to substantial competitive harm. Gov't's Mot. at 18. The Government fails, however, to identify the relevant public information, the relevant requested information, or the type of harm that might occur if the two were combined. The Government simply cannot rely on such "conclusory and generalized allegation[s]" to defeat disclosure. Public Citizen v. NIH, 209 F. Supp. 2d at 46.

In essence, the Parties again present a factual disagreement. Whether one concludes that early release of the requested data

could lead to undercutting depends on the light in which the evidence is examined. Thus, summary judgement is inappropriate. The record presented by the Parties is so incomplete and confusing on the issue of undercutting, that it alone precludes granting either Motion for Summary Judgment on this issue.[11]

### ii)   Innovation

According to the Government, release of plan benefits data before the Open Enrollment Period would "degrade[]" the "incentive for innovation" and thereby subject some insurers to competitive harm. Counihan Decl. at ¶ 8. Plaintiff notes that the Government's sole source for this claim is the affidavit of CCIIO Director Kevin Counihan and contends that such a "'bald assertion' by an agency declarant . . . is insufficient to support summary judgment." Pl.'s Resp. to Gov't's SMF at ¶ 12 (quoting Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 512 (D.C. Cir. 2011)). The Court agrees.

Moreover, Plaintiff notes that the ACA's requirements limit the aspects of insurance plans that insurers may manipulate in order to produce innovation. For example, the ACA requires health plans to cover specific, identified "essential health benefits," 42 U.S.C. § 300gg-6(a); meet certain minimum actuarial value

---

[11] Of course, the Government has to prevail at both steps of the National Parks test but has already failed to meet its burden at step one.

requirements, see id. § 18022(d); comply with maximum annual cost-
sharing limits, id. § 300gg-6(b); not discriminate in benefit
design, 45 C.F.R. § 156.125; and "[n]ot employ . . . benefit
designs that will . . . discourage the enrollment of individuals
with significant health needs," id. § 156.225(b).

In light of these statutory and regulatory limitations,
Plaintiff is correct that the ACA "has made it more difficult for
[insurers] to compete on the basis of plan benefit design." Pl.'s
Resp. to Gov't's SMF at ¶ 12. However, the existence of genuine
issues of material fact regarding the Government's other grounds
for withholding precludes a grant of summary judgment to Plaintiff.

### iii) Consumer Confusion

The Government argues that "[p]ublic release of [non-final]
information to consumers misinforms them of their benefits for a
particular plan, leading to competitive harm to the issuers whose
inaccurate, non-final information has been released." Gov't's Mot.
at 21 (citing Gov't's Att.3 at 41 [Dkt. No. 32-4]). The Government
notes that until insurers have signed their plan confirmation
agreements, they remain free to withdraw health plan offerings.
Consequently, consumers reviewing early-released data might find
plan offerings that are not actually included in the FFM.

-28-

Plaintiff, again citing the Government's process letters[12] to the insurers, argues that the Government exaggerates the extent to which insurers may change their data late in the review process. It also contends that the Government's argument -- that release of information will confuse the public -- runs counter to FOIA's purpose, which is to provide "a means for citizens to know what their Government is up to." Favish, 541 U.S. at 171.

The Government fails to respond to any of Plaintiff's arguments in its Reply. Moreover, the insurer letter the Government cites for the proposition that consumer confusion will lead to competitive harm, Gov't's Ex. 3 at 41 [Dkt. No. 32-4], does not even mention consumer confusion. Finally, our Court of Appeals has "emphasize[d] that [t]he important point for competitive harm in the FOIA context . . . is that it be limited to harm flowing from the affirmative use of proprietary information by competitors. Competitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement[.]" Public Citizen v. FDA, 704 F.2d at 1291. Even viewed in the light most favorable to the Government, it has failed to show that the harm it claims will arise from consumer confusion would be caused by competitors' use of proprietary information as Exemption 4 requires.

---

[12] See p. 23.

### 2.   Program Effectiveness

The Government also argues that it may withhold the requested data because early release would damage the effectiveness of the FFM program. Plaintiff denies that harm to "program effectiveness" is a valid basis for withholding under Exemption 4. Even if harm to program effectiveness is properly considered grounds for withholding, the Government has failed to demonstrate that release of the requested benefits data at any point before the beginning of the Open Enrollment Period would harm the FFM program. Consequently, summary judgment for the Government must be denied on this claim for the following reasons.

As described above, our Court of Appeals has adopted the two-pronged National Parks test, which considers the Government's interest in obtaining information from private entities and private parties' interest in avoiding competitive harm. National Parks, 498 F.2d at 770. In that case, the Court of Appeals mentioned, for the first time, program effectiveness in connection with Exemption 4. National Parks, 498 F.2d at 770 n.17 ("We express no opinion as to whether other governmental interests are embodied in this exemption. Cf. 1963 Hearings at 200 [sic] where the problems of compliance and program effectiveness are mentioned as governmental interests possibly served by this exemption.").

Following that decision, the U.S. Court of Appeals for the First Circuit interpreted National Parks to contemplate application of Exemption 4 to information that, if released, would harm government programs:

> [The National Parks test does not impose] a limitation on the number of legitimate interests which are protected by Exemption 4. . . . [I]n view of the legitimate governmental interest of efficient operation, it would do violence to the statutory purpose of Exemption 4 were the Government to be disadvantaged by disclosing information which serves a valuable purpose and is useful for the effective execution of its statutory responsibilities.

9 to 5 Org. for Women Office Workers v. Bd. of Governors of Fed. Reserve Sys., 721 F.2d 1, 9-10 (1st Cir. 1983).

Thereafter, out Court of Appeals expressed support for the First Circuit's ruling. Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 830 F.2d 278, 286 (D.C. Cir. 1987) ("Critical Mass I") (agreeing with the First Circuit's reasoning but holding that the Government had not shown how disclosure would harm the effective performance of the agency's responsibilities). Sitting en banc in Critical Mass III, our Court of Appeals later explained that while the National Parks test is not exclusive, the Court agreed with the "First Circuit's conclusion that the exemption also protects a governmental interest in administrative efficiency

-31-

and effectiveness." <u>Critical Mass III</u>, 975 F.2d at 879 (citing <u>Critical Mass I</u>, 830 F.2d at 286).[13]

The Government, of course, bears the burden of demonstrating with specific factual and evidentiary material that disclosure would cause the cited harm. 5 U.S.C. § 552 (a)(4)(B); <u>Comstock</u>, 464 F. Supp. at 807. The Government contends that maintaining the confidentiality of plan benefits data until the Open Enrollment Period begins is central to the FFM program's operation. Gov't's Mot. at 18. However, the Government has failed to show concretely how it (including the ACA and FFM) would be harmed through the release of information prior to the Open Enrollment Period, and instead relies on conclusory statements that are insufficient to carry the Government's burden. <u>See</u> <u>Comstock</u>, 464 F. Supp. at 807.

Returning to its concern about consumer confusion, the Government contends that pre-Open Enrollment disclosure would cause confusion and harm the effectiveness of the FFM as a "one stop shopping tool" for consumers to identify and purchase health plans. Gov't's Mot. at 18-19. The Government has failed to

---

[13]    The Second Circuit has criticized the Government's assertion of a right to withhold information that, if released, would harm Government programs. <u>Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.</u>, 601 F.3d 143, 150 (2d Cir. 2010) ("The 'program effectiveness' test, if applied as the [Government] invokes it, would give impermissible deference to the agency, and would be analogous to the 'public interest' standard rejected by the Supreme Court in the context of Exemption Five.") (citing <u>Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill</u>, 443 U.S. 340, 354 (1979)).

substantiate its claim that disclosure would result in consumer confusion with specific factual and evidentiary material. Moreover, the Government does not explain why public release of data after the beginning of the Open Enrollment Period would not be equally confusing to consumers given that such data is "regularly" updated after its release. See CCIIO, Health Insurance Marketplace Public Use Files (Marketplace PUF), CMS.GOV.[14]

The Government also fails to explain how consumer confusion would result in harm to the FFM program sufficient to warrant withholding. Consumers choosing to enroll in a health insurance plan through the FFM must complete CMS's application during the Open Enrollment Period whether by using HealthCare.gov, by calling the Marketplace Call Center, or by meeting with a professional. See Federal Marketplace Progress Fact Sheet, CMS.gov, http://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/ffe.html (updated May 31, 2013). The Government offers no reason why any confusion would not be cured upon a consumer's first interaction with the FFM itself.

The Government also contends -- improperly, for the first time in its Reply, Am. Wildlands v. Kempthorne, 530 F.3d 991, 1001 (D.C. Cir. 2008) -- that early release of information "would

---

[14]    Available    at    http://www.cms.gov/CCIIO/Resources/Data-Resources/marketplace-puf.html (last visited June 18, 2015).

likely" lead insurers to initially provide the Government with false data and make last minute changes before plan finalization. Gov't's Reply at 9. This is pure speculation. Moreover, the Government's concern hardly seems plausible in light of its own statement that after the initial submission period significant changes may not be made to benefit plans except with permission from CCIIO. Gov't's SMF at ¶14; 2015 CCIIO Letter at 10.

Thus, the Government has failed to carry its burden to demonstrate harm to program effectiveness. Because the Government has failed to show either competitive harm or harm to program effectiveness, its Motion for Summary Judgment must be denied.

## C.   Segregability

As Plaintiff points out, the Government has an obligation under FOIA to consider whether any portion of the requested data falls outside of Exemption 4 and is reasonably segregable from exempt data. See 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."); Powell v. U.S. Bureau of Prisons, 927 F.2d 1239, 1242 (D.C. Cir. 1991) ("[T]his court has long recognized that agencies . . . are obliged to determine whether nonexempt material can reasonably be segregated from exempt material."); Mead Data Cent. v. U.S. Dep't of Air Force, 566 F.2d 242, 261 (D.C.

-34-

Cir. 1977) ("[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts.").

In its Reply, the Government contends that release of <u>any</u> plan benefits data before the beginning of the Open Enrollment Period would cause FFM-participating insurers competitive harm and that therefore, none of the requested data is reasonably segregable from data covered by Exemption 4. Because both Parties' Motions for Summary Judgment are being denied, the Court need not at this time assess the merits of the Government's position.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment shall be **denied** and Defendants' Motion for Summary Judgment shall be **denied**.

The Court warns the Parties that any future filings <u>must</u> contain clearer presentation of the facts underlying this case.

July 1, 2015
_____
Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF

-35-